608 So.2d 52 (1992)
TAMPA-HILLSBOROUGH COUNTY EXPRESSWAY AUTHORITY, Appellant,
v.
A.G.W.S. CORPORATION, Appellee.
TAMPA-HILLSBOROUGH COUNTY EXPRESSWAY AUTHORITY, Appellant,
v.
DUNDEE DEVELOPMENT GROUP, Appellee.
Nos. 92-00065, 91-03263.
District Court of Appeal of Florida, Second District.
September 23, 1992.
William C. McLean, Jr., William C. McLean, Jr., P.A., Tampa, for appellant.
S. Cary Gaylor, Marc I. Sachs, and Alan E. DeSerio, Brigham, Moore, Gaylord, Wilson, Ulmer, Schuster and Sachs, Tampa, for appellees.
Thornton J. Williams, Gen. Counsel, and Thomas F. Capshew, Asst. Gen. Counsel, for amicus curiae Florida Dept. of Transp.
PER CURIAM.
Affirmed. See Orlando/Orange County Expressway Auth. v. W & F Agrigrowth-Fernfield, Ltd., 582 So.2d 790 (Fla. 5th DCA 1991). We also agree to certify to the supreme court the question posed by Judge Altenbernd's dissent as follows:
WHETHER ALL LANDOWNERS WITH PROPERTY INSIDE THE BOUNDARIES OF INVALIDATED MAPS OF RESERVATION UNDER SUBSECTIONS 337.241(2) AND (3), FLORIDA STATUTES (1987), ARE LEGALLY ENTITLED TO RECEIVE PER SE DECLARATIONS OF TAKING AND JURY TRIALS TO DETERMINE JUST COMPENSATION.
CAMPBELL, A.C.J., and HALL, J., concur.
CAMPBELL, A.C.J., concurring specially with opinion.
ALTENBERND, J., dissenting with opinion.
CAMPBELL, Acting Chief Judge, Specially concurring.
I have concurred with Judge Hall that we must affirm these consolidated cases on the authority of Orlando/Orange County Expressway Authority v. W & F Agrigrowth-Fernfield, Limited, 582 So.2d 790 (Fla. 5th DCA 1991), because I believe that case is a correct interpretation of the state of the law in Florida regarding the issues raised in these cases based upon the precedent of Joint Ventures, Inc. v. Department of Transportation, 563 So.2d 622 (Fla. 1990).
Since I am bound by the precedent of our supreme court in Joint Ventures, I conclude I must affirm. See Hoffman v. Jones, 280 So.2d 431 (Fla. 1973). Were I able to decide otherwise, I would agree with Judge Altenbernd, for I conclude his reasoning is sound. My concern arises because cases such as these which find that a taking has occurred based upon the authority of Joint Ventures may well involve landowners who have suffered no actual damage. Yet, because a taking has, under Joint Ventures, been found to have taken place, we must offer those landowners an opportunity to prove whether or not they have suffered actual damages. This could result in the state being liable for substantial costs and attorney's fees.
ALTENBERND, Judge, dissenting.
These consolidated cases involve two landowners, each having had a portion of its land temporarily affected by a map of reservation recorded pursuant to subsections 337.241(2) and (3), Florida Statutes (1987). The map was intended to preserve land for use in a future transportation corridor. Such maps and their underlying statutory basis were invalidated by the supreme court in Joint Ventures, Inc. v. Department of Transportation, 563 So.2d 622 *53 (Fla. 1990). Thus, for a period of about two years, this recorded map limited development opportunities for the portions of land inside the corridor.
After the decision in Joint Ventures, these two landowners filed inverse condemnation actions seeking monetary damages for the temporary taking of their land. The trial court followed the Fifth District and granted a partial summary judgment, holding that a temporary taking of these lands had occurred, even if the specific parcels were not substantially affected by the recorded map. See Orlando/Orange County Expressway Auth. v. W & F Agrigrowth-Fernfield, Ltd., 582 So.2d 790 (Fla. 5th DCA), review denied, 591 So.2d 183 (Fla. 1991).[1]
The issue in this case is whether the supreme court in Joint Ventures truly intended to establish a per se inverse condemnation claim for such landowners. If so, then every corridor landowner is entitled to a jury trial on the issue of just compensation, even if it sustained no substantial interference with the use of its land during the brief period these statutes were in effect.
I cannot accept the Fifth District's opinion as a true reflection of the intent of the supreme court or as an appropriate per se rule of constitutional law. I would obey the reasoning in Joint Ventures, as well as recent United States Supreme Court precedent, and hold that a landowner is not entitled to just compensation, attorney's fees, and costs as a result of these short-lived maps of reservation unless it establishes at trial that the temporary existence of such a map actually deprived it of a substantial "economically beneficial or productive use of [its] land." See Lucas v. South Carolina Coastal Council, ___ U.S. ___, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). Because of the ambiguity I perceive within Joint Ventures, I would also certify this issue to the supreme court.

I. THE FACTS
In the mid-1980s, the legislature enacted section 337.241, Florida Statutes (1987).[2] *54 In general, this statute allowed the Department of Transportation and any expressway authority to prepare and record maps of reservation, indicating corridors of land which could be used for road development or improvement in the future. Subsection (2) of the statute restricted development within these corridors. Subsection (3) gave an affected property owner the right to an administrative hearing, essentially to compel the state to acquire the affected property.
In January 1988, the First District upheld the constitutionality of this statute, but certified to the supreme court a question concerning the constitutionality of subsections (2) and (3). Joint Ventures, Inc. v. Dep't of Transp., 519 So.2d 1069 (Fla. 1st DCA 1988). On April 26, 1990, the supreme court answered the question and declared these statutory subsections unconstitutional in a sharply divided decision. Joint Ventures v. Dep't of Transp., 563 So.2d 622 (Fla. 1990).
The Tampa-Hillsborough County Expressway Authority (the Authority) filed a map of reservation on July 8, 1988, describing a corridor running north-south in an area generally west of Dale Mabry Highway. This occurred after the First District's opinion in Joint Ventures, but before the supreme court's opinion. The restrictions on development created by this map were effectively eliminated when the supreme court invalidated the relevant subsections on April 26, 1990.
In early 1991, Dundee Development Group (Dundee) filed a complaint alleging a temporary taking of its land under the Authority's map of reservation and seeking damages for the period from July 8, 1988, to April 26, 1990. The complaint states that, at all relevant times, Dundee owned 205.53 acres located on the north side of Van Dyke Road, approximately one mile west of Dale Mabry Highway. It claims that a "significant portion" of Dundee's land falls inside the corridor and that the corridor bisects this property.[3]
The complaint alleges a taking under several different legal tests. First, it maintains that the map of reservation had left "the property within the map of reservation with no utility or economically beneficial use." In the alternative, it alleges that the map constituted a "physical invasion" of the property. Third, the map destroyed Dundee's "investment-backed expectations." Finally, the map resulted in "the denial of a substantial portion of the beneficial use of [Dundee's] property." Procedurally, it is important to realize that under the rule announced by the Fifth District in Agrigrowth, Dundee was not required to prove any of these theories before it obtained a partial summary judgment declaring a taking.
In the trial court, the Authority moved to dismiss, and Dundee moved for summary judgment. The Authority filed an affidavit in opposition to summary judgment stating that the land in question was "vacant pasture, improved pasture lands currently used for agricultural purposes." The trial court granted summary judgment on the issue of taking because it was undisputed that Dundee owned the land and the land was partially inside the reservation. Under the rationale of Agrigrowth, "no proof of loss in market value [was] necessary to *55 establish a taking. Loss of value is relevant to the issue of the amount of full compensation to be paid to [the landowner]." 582 So.2d at 792.
At this point in these proceedings, the judicial determination of a constitutional taking has occurred and a jury will be convened to determine damages. See Dep't of Agric. & Consumer Servs. v. Polk, 568 So.2d 35 (Fla. 1990). The jury will decide whether those damages are large, small, or even nominal. The trial court will then enter judgment for that amount, plus attorney's fees and costs.[4]

II. THE PROBLEMATIC HOLDING IN JOINT VENTURES

In Joint Ventures, the supreme court held that subsections 337.241(2) and (3), Florida Statutes (1987), unconstitutionally permitted the state to take private property without just compensation, and declared those statutes "invalid as a violation of the fifth amendment to the United States Constitution and article X, section 6(a), of the Florida Constitution." 563 So.2d at 623. Despite this express holding under a just compensation theory, the court emphasized that the issue on appeal was not an individual's right to compensation. For example, the court stated:
[W]hen compensation is claimed due to governmental regulation of property, the appropriate inquiry is directed to the extent of the interference or deprivation of economic use.

Here, however, we do not deal with a claim for compensation, but with a constitutional challenge to the statutory mechanism. Our inquiry requires that we determine whether the statute is an appropriate regulation under the police power, as DOT asserts, or whether the statute is merely an attempt to circumvent the constitutional and statutory protections afforded private property ownership under the principles of eminent domain.
Joint Ventures, 563 So.2d at 625 (emphasis added). Moreover, the opinion relies upon First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987), which clearly contemplates a per se temporary taking only if "all use of property" is affected.
Despite the language in the opinion which seems to facially invalidate these statutes on a just compensation theory, I conclude it is unfair to read the Florida Supreme Court's opinion as if it intentionally created a remedy under a per se rule of temporary taking for use in inverse condemnation proceedings involving any portion of land inside these reserved corridors. Because the supreme court, in its holding, cited article X, section 6(a), rather than article I, section 9, of the Florida Constitution, I can fully understand why the majority believes it must declare a per se rule. Nevertheless, I am convinced that the strong disagreement between the majority and the dissent led to polarized discussions in the Joint Ventures opinion and that the majority opinion simply did not fully enunciate its reasoning. Between the polarized positions, there is a middle ground of substantive due process. The heart of the majority's reasoning in Joint Ventures relies upon this middle ground.

III. THE REASONING IN JOINT VENTURES

This case involves two similar constitutional theories: just compensation and deprivation of property without due process. A landowner's right to just compensation is provided in article X, section 6(a), in conjunction with the state's right concerning eminent domain.[5] Article I, section 9, prevents a taking of property without due *56 process.[6] While these protections appear in separate sections of the Florida Constitution, they are adjacent to one another in the fifth amendment to the United States Constitution.[7] Despite the similarity between these theories, it is clear that "just compensation"[8] and "deprivation of property without due process" are separate and distinct constitutional theories. Both involve "takings" and "police power," but the analysis of these concepts under a just compensation theory is different from the analysis under a due process theory. Thus, it is critical that a just compensation "taking" not be confused with a "taking" without due process.
A review of the precedent shows that a statute may be valid under one of these two theories, but invalid under the other. See Dep't of Agric. v. Mid-Florida Growers, Inc., 521 So.2d 101 (Fla.), cert. denied, 488 U.S. 870, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988); Graham v. Estuary Properties, 399 So.2d 1374 (Fla.), cert. denied, 454 U.S. 1083, 102 S.Ct. 640, 70 L.Ed.2d 618 (1981); Conner v. Reed Bros., Inc., 567 So.2d 515 (Fla. 2d DCA 1990). A landowner may be entitled to damages under one theory, but not under the other. See Mid-Florida Growers; Conner. At least as a matter of logic, any legally available result under a due process theory can occur in connection with any available result under a just compensation theory.[9]
Subsections 337.241(2) and (3) may be facially unconstitutional, as an improper exercise of police power under a theory of due process, but they are not facially unconstitutional under a theory of just compensation. Facial unconstitutionality under a theory of just compensation only occurs when, as a matter of law, a statute necessarily results in an uncompensated taking of all affected property. See Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 501-01, 107 S.Ct. 1232, 1250, 94 L.Ed.2d 472, 498 (1987) (statute cannot be held facially invalid under takings clause unless it is shown to result in taking of all affected property); Glisson v. Alachua County, 558 So.2d 1030, 1037 (Fla. 1st DCA) (to find statute facially invalid under takings clause, it must deprive every affected parcel of land of all economically viable use), review denied, 570 So.2d 1304 (Fla. 1990).
Facial unconstitutionality under a just compensation theory is the result of a per se taking without adequate procedures to provide prompt, just compensation. Although it may have been unclear at the time Joint Ventures was decided, it is now quite clear that only two conditions justify a judicial determination of a per se taking. The United States Supreme Court has limited per se violations of the takings clause to "two discrete categories." Lucas, ___ U.S. ___, ___, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798, 812 (1992). These per se violations are restricted to statutes that mandate a physical invasion of all affected properties or to statutes that necessarily take all economic use of all parcels of property affected by the law. See Lucas; Glisson. In examining the first category, the recorded map of reservation does not constitute *57 a physical invasion of property. See, e.g., Northcutt v. State Rd. Dep't, 209 So.2d 710 (Fla. 3d DCA 1968) (road construction on adjacent property not a taking requiring just compensation because it involved no physical invasion of subject property), writ discharged, 219 So.2d 687 (Fla. 1969).
In considering the second category, it is obvious that subsections 337.241(2) and (3) did not take "all economically beneficial or productive use"[10] of every parcel of land subject to this reservation. Undoubtedly, many parcels inside the corridor were virtually unaffected by the recorded map.[11] It is difficult to believe that the owner of scrub land, citrus groves, and other agricultural acreage sustained substantial economic injury by the filing of this map. A person, who had a home inside this area and had no intention of moving unless and until the state exercised its power of eminent domain, would find it difficult to prove substantial damage as a result of the map of reservation.[12]
In light of Lucas, any suggestion that these statutes were invalidated in Joint Ventures on the basis of a facial just compensation theory, thereby creating a multitude of per se takings in the context of inverse condemnation, is simply unsupported by the relevant facts. Especially when the supreme court took pains to demonstrate that it was not deciding issues associated with a claim for compensation, I am unwilling to attribute such an illogical result to that court.[13]
On the other hand, it is quite clear that the majority opinion in Joint Ventures invalidated these statutes under substantive due process. To be valid under due process principles, a regulation must be rationally related to a legitimate state interest. Joint Ventures, 563 So.2d at 625. The legislative history of section 337.241, as well as the Department's argument in the case, led the supreme court to conclude that the purpose of the limitations on development was to "freeze" the value of the affected properties in order to "reduce the cost of acquisition should the state later decide to condemn the property." Id. at 626. Citing several cases that invalidated attempts to depress land values in order to reduce the future cost of acquiring property by eminent domain, the court found that this purpose was not a legitimate state interest. Id. Such application of the due *58 process balancing test is found throughout the Joint Ventures opinion.
In contrast, the majority's opinion does not discuss whether every parcel within the corridor was rendered economically useless. Such a discussion would be required for a finding of facial invalidity under a just compensation theory. Therefore, regardless of the constitutional provision cited by the majority in Joint Ventures, I conclude that the statute was invalidated by application of the substantive due process balancing test, rather than as a matter of eminent domain or just compensation.
The two landowners in this case have not obtained a judicial declaration of taking on a due process theory, nor have they proven that the statutes resulted in a just compensation taking as applied to their land. I recognize that these statutory subsections may indeed have had substantial impact upon specific parcels within the reserved land. Such substantially affected landowners have the right to file inverse condemnation actions challenging the subsections as applied and to receive damages if successful. There are, however, important practical distinctions between litigation on an "as applied" takings theory and a per se just compensation takings theory.

IV. THE PRACTICAL RAMIFICATIONS
Whether the landowners must prove a substantial economic deprivation before they can receive a judicial determination that a taking has occurred, or whether Joint Ventures renders such a map a per se taking entitling every affected landowner to just compensation, is not an esoteric issue of interest only to constitutional theorists. It has very practical ramifications for the judicial system, for the Department of Transportation, for the expressway authorities, and for the landowners whose properties lie within these corridors.
If the issue in an inverse condemnation proceeding is whether a taking has occurred, the burden of proof is on the landowner and the issue is tried before a judge. Dep't of Agric. and Consumer Servs. v. Polk, 568 So.2d 35 (Fla. 1990); Sarasota-Manatee Airport Auth. v. Alderman, 238 So.2d 678 (Fla. 2d DCA 1970). If the landowner loses, the state is not responsible for the landowner's costs or attorney's fees. See The Florida Bar, Continuing Legal Education, Florida Eminent Domain Practice and Procedure § 13.34 (4th ed. 1988). As a result, the landowner accepts an economic risk by filing the action. Presumably a rational landowner will only file such an action if there is solid evidence that the map of reservation caused the landowner substantial economic harm.
On the other hand, if a taking has been established and the only issue is the amount of just compensation to be awarded, the matter will be tried by jury. Under the per se approach adopted by the majority and Agrigrowth, the jury will be informed that the court has found a taking as a matter of law and that the jury's function is merely to determine just compensation. See § 73.071(3), Fla. Stat. (1991); The Florida Bar, Continuing Legal Education Florida Eminent Domain Practice and Procedure § 11.2. Although a jury can certainly award zero damages for the elements of severance or business damages in an inverse condemnation case, a jury cannot legally award zero damages as just compensation for an entire constitutional taking. If a jury could legally award zero damages, this would mean that the state could "take" property that had no value. This would trivialize the constitutional right to just compensation. See County of Sarasota v. Burdette, 479 So.2d 763 (Fla. 2d DCA 1985) (even where state presented no evidence as to value of property taken, jury could not have awarded zero damages just compensation), review denied, 488 So.2d 830 (Fla. 1986).
Even in a case involving nominal damages, the state will bear the burden of the landowner's costs and attorney's fees. Volusia County v. Pickens, 435 So.2d 247 (Fla. 5th DCA), review denied, 443 So.2d 980 (Fla. 1983). Thus, landowners will risk little or nothing in bringing suit. Even if its damages are minimal or speculative, virtually every landowner will have an incentive to file suit. I believe that the constitution *59 is a rational document and should not be interpreted to reach such an irrational result.

VI. CONCLUSION
Because it is apparent that the maps of reservation recorded under section 337.241 involved several corridors throughout Florida and that hundreds or even thousands of landowners could be entitled to jury trials on the issue of just compensation under the per se analysis adopted by the majority and the Fifth District, I would certify the following question to the supreme court:
WHETHER ALL LANDOWNERS WITH PROPERTY INSIDE THE BOUNDARIES OF INVALIDATED MAPS OF RESERVATION UNDER SUBSECTIONS 337.241(2) AND (3), FLORIDA STATUTES (1987), ARE LEGALLY ENTITLED TO RECEIVE PER SE DECLARATIONS OF TAKING AND JURY TRIALS TO DETERMINE JUST COMPENSATION.
NOTES
[1] The trial court was obligated to follow the controlling opinion from the Fifth District and, thus, I do not fault its decision. See Pardo v. State, 596 So.2d 665 (Fla. 1992).
[2] § 337.241 provided as follows:

(1) The department or any expressway authority created under chapter 348 with eminent domain authority pursuant to chapter 74 shall acquire all rights-of-way and may prepare and record maps of reservation for any road within its jurisdiction or for any road for which it administers the right-of-way fund. Any such maps shall delineate the limits of the proposed right-of-way for the eventual widening of an existing road or shall delineate the limits of proposed rights-of-way for the initial construction of a road. Before recording such map, the department or expressway authority shall advertise and hold a public hearing and shall notify all affected property owners of record, as recorded in the property appraiser's office, and all local governmental entities in which the right-of-way is located, by mail at least 20 days prior to the date set for the hearing. After the public hearing, the department or expressway authority shall send the map to the clerk of the court of the affected county, who shall forthwith record the map in accordance with chapter 177 in the public land records of the county. Minor amendments to such maps are not subject to the notice and public hearing provisions of this section, except that property owners directly affected by changes in a minor amendment and all local governmental entities in which a minor amendment occurs must be notified by mail. Minor amendments are defined as those changes which affect less than 5 percent of the total right-of-way within the map.
(2) Upon recording, such map shall establish:
(a) A building setback line from the centerline of any road existing as of the date of such recording; and no development permits, as defined in s. 380.031(4), shall be granted by any governmental entity for new construction of any type or for renovation of an existing commercial structure that exceeds 20 percent of the appraised value of the structure. No restriction shall be placed on the renovation or improvement of existing residential structures, as long as such structures continue to be used as private residences.
(b) An area of proposed road construction within which development permits, as defined in s. 380.031(4), shall not be issued for a period of 5 years from the date of recording such map. The 5-year period may be extended for an additional 5-year period by the same procedure set forth in subsection (1).
(3) Upon petition by an affected property owner alleging that such property regulation is unreasonable or arbitrary and that its effect is to deny a substantial portion of the beneficial use of such property, the department or expressway authority shall hold an administrative hearing in accordance with the provisions of chapter 120. When such a hearing results in an order finding in favor of the petitioning property owner, the department or expressway authority shall have 180 days from the date of such order to acquire such property or file appropriate proceedings. Appellate review by either party may be resorted to, but such review will not affect the 180-day limitation when such appeal is taken by the department or expressway authority unless execution of such order is stayed by the appellate court having jurisdiction.
(4) Upon the failure by the department or expressway authority to acquire such property or initiate acquisition proceedings, the appropriate local governmental entity may issue any permit in accordance with its established procedures.
[3] It is unclear how much acreage constituted the "significant portion." At least in legal argument, the Authority suggests that the affected portion of the land is less than 10% of the total parcel. Under well-established precedent, an inverse condemnation action concerning a use restriction affecting only a portion of a parcel of property is difficult, if not impossible, to prove. See State, Dep't of Envtl. Reg. v. Mackay, 544 So.2d 1065 (Fla. 3d DCA 1989); see also State, Dep't of Envtl. Reg. v. Schindler, 604 So.2d 565 (Fla. 2d DCA 1992).
[4] To avoid complexity, this opinion does not summarize the facts concerning the consolidated appeal. The claim of A.G.W.S. Corporation is factually and procedurally similar to Dundee's. A.G.W.S. owns a 38.8-acre parcel, a portion of which is inside the same corridor.
[5] "No private property shall be taken except for a public purpose and with full compensation therefor paid to each owner or secured by deposit in the registry of the court and available to the owner." Art. X, § 6(a), Fla. Const.
[6] "No person shall be deprived of life, liberty or property without due process of law... ." Art. I, § 9, Fla. Const.
[7] "No person shall be ... deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V.
[8] The constitutional right to just compensation is frequently referred to as the "takings clause." Because I am attempting to distinguish between a taking of property without due process and a taking for purposes of eminent domain, I will refer only to just compensation to avoid confusion.
[9] For examples of cases recognizing different causes of action under just compensation and due process, see Eide v. Sarasota County, 908 F.2d 716 (11th Cir.1990), cert. denied, ___ U.S. ___, 111 S.Ct. 1073, 112 L.Ed.2d 1179 (1991); Executive 100, Inc. v. Martin County, 922 F.2d 1536 (11th Cir.1991); See generally The Florida Bar, Continuing Legal Education Florida Eminent Domain Practice and Procedure § 13.27 (4th ed. 1988).

For examples of other results on these two theories, see Belcher v. Florida Power & Light Co., 74 So.2d 56 (Fla. 1954) (constitutional under both theories); Storer Cable T.V. of Florida, Inc. v. Summerwinds Apartments Assocs., 493 So.2d 417 (Fla. 1986) (unconstitutional under both theories).
[10] It appears that a deprivation of "all" economic use is necessary to declare a per se taking, whereas only "substantial" deprivation is required to entitle an individual landowner to just compensation in a case-specific context. See Lucas v. South Carolina Coastal Council, ___ U.S. ___, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); Sarasota-Manatee Airport Auth. v. Icard, 567 So.2d 937 (Fla. 2d DCA 1990), review denied, 576 So.2d 288 (Fla. 1991). Because some parcels within these corridors almost certainly suffered minimal, if any, damage as a result of the map, even the lesser "substantial" loss threshold cannot be met by all affected parcels.
[11] Indeed, some landowners with parcels that include small portions inside the corridor may actually have benefitted from the map. Before the map, the landowners knew a road was proposed but had little assurance where it would be built. Such uncertainty can affect one's ability to develop property. After the recording of a map, a landowner can predict the course of a roadway with greater certainty. In this case, for example, it is possible that the corridor prevented development of 20 acres, while allowing the remaining 185 acres to be developed with some assurance that a road would be built nearby.
[12] I am assuming that the state could not use the filing of the map as evidence of reduced land values in a formal condemnation proceeding. See Board of Comm'rs v. Tallahassee Bank & Trust Co., 108 So.2d 74, 81 (Fla. 1st DCA 1958) (it would be "totally unjust" to permit the state to rely on ordinances restricting land use as evidence of depressed land values in effort to reduce amount of just compensation awarded in eminent domain proceeding), writ quashed, 116 So.2d 762 (Fla. 1959).
[13] Recently, the Eleventh Circuit has suggested that a just compensation claim is unavailable if a landowner seeks to invalidate a regulation. "Just compensation claims admit and assume that the subject regulation substantially advances a legitimate government interest; the validity of the regulation is not at issue." Reahard v. Lee County, 968 F.2d 1131 (11th Cir.1992). While I doubt this is true concerning a claim for a temporary taking, it is arguable that an order invalidating a statute under a just compensation theory leaves landowners with a damages remedy only under a due process theory. See Houle v. Twachtmann, 6 F.L.W. Fed. 358, 1992 WL 209631 (N.D.Fla. Mar. 11, 1992).